**UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA**

**Alexandria Division**

F I L E D

OCT 2 8 2011

CLERK, U.S. DISTRICT COURT
ALEXANDRIA, VIRGINIA

TORI LAKSHIA DAY,                    )
                                     )
                Plaintiff,           )
                                     )
v.                                   )      Civil Action No. 1:11-cv-97
                                     )
RUSSELL B. MILAM, et al.,            )
                                     )
                Defendants.          )

## MEMORANDUM OPINION

THIS MATTER comes before the Court on both Defendant Russell B. Milam's and Defendant Fairfax County Crime Solvers, Inc.'s Motions for Summary Judgment.  This case concerns Plaintiff Tori Lakshia Day's ("Plaintiff Day") allegations that Russell B. Milam ("Officer Milam"), in addition to committing several common law torts, deprived her of constitutional rights in violation of 42 U.S.C. § 1983 when he mistakenly identified her as the fugitive named in two outstanding arrest warrants and placed her into custody.  Plaintiff Day further alleges that both Officer Milam and Fairfax County Crime Solvers ("Crime Solvers") defamed her by causing to be published and publishing, respectively, Plaintiff Day's DMV photograph on Crime Solvers' website under its "Fugitive of the Week" webpage, and captioning the photograph, "Wanted for distribution of cocaine and

contributing to the delinquency of a minor." There are three issues before the Court. The first issue is whether Officer Milam's conduct leading up to the arrest of Plaintiff Day was objectively reasonable so as to entitle him to qualified immunity under § 1983, and as such, to qualified immunity for the common law tort claims of battery, assault, and false arrest and false imprisonment. The second issue is whether Officer Milam was entitled to the qualified privilege from defamation of Plaintiff Day when he caused the widespread publication of her DMV photograph and injurious and false statements about her criminal activity. The third issue is whether Crime Solvers was excused from defaming Plaintiff Day under the doctrine of charitable immunity after it republished the incorrect information provided to it by Officer Milam.

Plaintiff Tori Lakshia Day was falsely accused of and mistakenly arrested for two outstanding criminal charges committed by one Tori Nikea Day. When criminal warrants are issued in Fairfax County, it is a common practice for the Fairfax County Police Department to report information regarding wanted fugitives to Defendant Crime Solvers. Crime Solvers is a § 501(c)(3) nonprofit Virginia corporation that provides a crime solving service for the benefit of the greater Fairfax County community by operating and maintaining its website about wanted fugitives for public consumption. Defendant Officer Milam is

2

and has been, at all times heretofore, a Fairfax County police officer and supervisor of the police department's Warrant Section.[1]  Although Officer Milam's arrest of Plaintiff Day occurred on November 5, 2009, the genesis of this story occurred months earlier.

On July 19, 2009, Fairfax County Police Officer Leanna Wilson obtained two arrest warrants for one Tori Nikea Day ("Fugitive Day"): (1) a felony warrant for distributing a Schedule II drug to her 14 year old sister; and (2) a misdemeanor warrant for contributing to the delinquency of a minor.  Having difficulty locating the whereabouts of Fugitive Day, fellow Officer Mark Yawornicky sought the assistance of Officer Milam to find her, one "Tori Day."  Milam was specifically requested to locate "Tori Day" because he was responsible for maintaining the warrants and organizing warrant sweeps for the execution of warrants.  Officer Yawornicky did not give a middle name for "Tori Day," but told Milam only that the fugitive was a black female in her twenties.  Shortly thereafter, Officer Yawornicky sent Milam an email regarding Fugitive Day, providing her father's name and advising that she

---

[1] Although Plaintiff Day originally named as defendants numerous other parties including the County of Fairfax, Fairfax County Police Department, Officer Milam, Crime Solvers, four Doe defendants, and five other persons in their official and individual capacities, only Officer Milam and Crime Solvers remain as defendants in the case.

3

might be attending night school.  Milam neither received nor requested any further information from Officer Yawornicky regarding Fugitive Day.

Without reviewing the warrants for Fugitive Day, Officer Milam performed a computer search of the Fairfax County police database using only the name "Tori Day" as the search term.  His search returned a trespassing arrest for Plaintiff Tori Lakshia Day, a black female aged 38, and her social security number. Without attempting to compare Plaintiff Day's social security number the one listed in the warrants for Fugitive Day, Officer Milam proceeded to use Plaintiff Day's social security number and date of birth to search for further information from the Virginia Department of Motor Vehicles ("DMV").  His DMV records search produced a photographic image of Plaintiff Day.  Again, no effort was made by Officer Milam to ensure that Plaintiff Day was, in fact, the fugitive identified in the arrest warrants.

On October 29, 2009, Officer Milam emailed the DMV photograph of Plaintiff Day and a description of the charges on the warrants for Fugitive Day to the Fairfax County Police Public Information Office for the purpose of having the information published on Crime Solvers' website.  The next day, the Public Information Office emailed the information provided by Milam to Crime Solvers.  Once received by Crime Solvers, its website was promptly updated to include Plaintiff Day's

photograph and the caption, "Wanted for distribution of cocaine and contributing to the delinquency of a minor."  Plaintiff Day was featured as Crime Solvers' "Fugitive of the Week" from the time of posting until November 5, 2009, when Officer Milam instructed that the webpage be taken down.  At no point in time did Crime Solvers independently investigate the veracity of the information provided to it from Officer Milam, nor does Crime Solvers ever attempt to verify or research the information provided by the Fairfax County Police Department.  In fact, Crime Solvers possesses no resources or means to verify the information it receives from the Fairfax County Police Department.

Once Officer Milam had caused Plaintiff Day's information to be published on Crime Solvers' website, he proceeded to run Plaintiff Day's social security number through the Virginia Employment Commission database to ascertain where she worked.  His search revealed that she worked for a company called Bridgestone in Arlington, Virginia.  On the morning of November 5, 2009, Officer Milam arrived at Bridgestone's location in Arlington prepared to make the arrest and was advised that "Tori Day" worked for the company, but at their Herndon location.  He then proceeded to Bridgestone's Herndon location, now with two Herndon detectives and Herndon Officer Denise Randles.

When the officers arrived at about 10:15 a.m. on November 5, 2009, Milam and the two Herndon detectives entered the building, identified themselves as officers and Milam asked for "Tori Day."  Plaintiff Day came out and Officer Milam informed her that he had warrants for her arrest, but did not specify the charges.  Although Plaintiff Day's precise reaction to this news is disputed, it is conceded that she remained calm and did not act alarmed.  Officer Milam then led her just outside the building and, in sight of the building and several of her coworkers, removed her purse while Officer Randles searched her person, handcuffed her, and placed her under arrest.  Once again, although Plaintiff Day's purse contained information regarding her full name, age, date of birth, and social security number, none of the officers elected to avail themselves of this information.

After Plaintiff Day was searched and arrested, she was placed into a Herndon police vehicle and transported to the Fairfax County Adult Detention Center.  When Officer Milam joined Plaintiff Day at the detention center, she was brought in for processing.  It was at this time that Officer Milam picked up the arrest warrants and, for the first time, became aware of Fugitive Day's middle name, Nikea, her date of birth, and her social security number.  While she was being processed, the officers searched her again, finding no contraband.  Plaintiff

Day was then advised by the officers present that she was going to be strip-searched, so she should provide them with any contraband she had on her person.  Plaintiff Day's belongings were placed in a large bag and, still in handcuffs, she was sent to see the magistrate.

The magistrate twice called the name, Tori Nikea Day, and Plaintiff Day said nothing.  The third time the magistrate called the name, "Miss Day," at which point Plaintiff Day approached the magistrate's window.  The magistrate explained that Plaintiff was being arrested for giving Percocet to her fourteen year old sister.  Plaintiff Day informed the magistrate that she did not have any siblings, and provided the magistrate with her social security number and date of birth.  The magistrate then compared Plaintiff Day's information with that of Fugitive Day in the arrest warrants and determined that Plaintiff Tori Lakshia Day was not the fugitive, Tori Nikea Day, identified in the warrants.  Officer Milam then checked Plaintiff Day's identification and realized for the first time that he had arrested the wrong person.  Although both were young black females, 5'2" and 140-45 pounds, and named Tori Day, their middle names, dates of birth, and social security numbers were different.  Milam immediately removed the handcuffs from Plaintiff Day and de-arrested her.

7

Officer Milam drove Plaintiff Day back to work and explained that the arrest had been a mistake.  He apologized to her and gave her his contact information in case she experienced any further issue related to her mistaken arrest.  Plaintiff Day admits that Officer Milam was professional at all times.  They returned to her workplace around 1:30 p.m., nearly three hours later after the ordeal had begun.  Despite being extensively searched and seized, Plaintiff Day was not fingerprinted, photographed, or placed in a holding cell, and has no arrest record from this incident.

On October 22, 2010, Plaintiff Day filed this suit in the Circuit Court of Fairfax County.  In her Complaint, Plaintiff Day alleges the following Counts: I (Negligence); II (Gross Negligence); III (Willful and Wanton Negligence); IV (violation of 42 U.S.C. § 1983 and the Fourth Amendment by Officer Milam); V (Defamation Per Se); VI (Defamation);[2] VII (Battery); VIII (Assault); IX (False Arrest and False Imprisonment); and X (Vicarious Liability).[3]  On January 28, 2011, the Defendants timely filed their Notice of Removal to this Court.  Upon Officer Milam's Motion to Dismiss, Counts I-III (Negligence,

---

[2] Only Counts V (Defamation Per Se) and Count VI (Defamation) also apply to Crime Solvers.  Plaintiff Day alleges Officer Milam to be liable on Counts I-IX.

[3] This Count was dismissed when the only defendant to whom it applied, Defendant County of Fairfax, was dismissed from the case on March 11, 2011.

Gross Negligence, and Willful and Wanton Negligence) were dismissed by the Court on March 11, 2011.  Both Defendant Officer Milam and Defendant Crime Solvers now each move the Court for summary judgment on all remaining Counts of the Complaint pursuant to Federal Rule of Civil Procedure 56.

The Court will grant summary judgment when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56.  Rule 56 mandates the entry of summary judgment against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case.  Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986).  The Court construes all reasonable inferences in favor of the non-moving party when determining whether there is a genuine issue of material fact.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255 (1986).  The mere existence of some disputed facts does not merit a trial unless the disputed facts are material to an issue necessary for proper resolution of the case and the quality and quantity of the evidence offered to support a question of fact are adequate to support a jury verdict. Thompson Everett, Inc. v. Nat'l Cable Adver., L.P., 57 F.3d 1317, 1323 (4th Cir. 1995).

The Court grants Officer Milam's Motion for Summary Judgment on the § 1983 and common law tort claims because his arrest of Plaintiff Day was supported by probable cause and objectively reasonable, entitling him to qualified immunity. Actions under 42 U.S.C. § 1983 based upon claims of false arrest or false imprisonment are properly analyzed as unreasonable seizures under the Fourth Amendment. Brown v. Gilmore, 278 F.3d 363, 369 (4th Cir. 2002); Rogers v. Pendleton, 249 F.3d 279, 294 (4th Cir. 2001). "The Fourth Amendment is not violated by a seizure or arrest supported by probable cause, even though the wrong person is arrested." Graham v. Connor, 490 U.S. 386, 396 (1989) (internal citation omitted). Probable cause exists when the facts and circumstances within an officer's knowledge are sufficient to warrant a prudent man in believing that the suspect had committed the offense. Beck v. Ohio, 379 U.S. 89, 91 (1964).

When the wrong individual is mistakenly arrested, "the relevant question in not whether there was probable cause to arrest the mistaken arrestee. Rather, one must ask whether probable cause existed to arrest the suspect for whom the officers have mistaken the arrestee." Schultz v. Braga, 290 F. Supp. 2d 637, 649 (D. Md. 2003) (citing Taft v. Vines, 70 F.3d 304, 310 (4th Cir. 1995). Thus, "[w]hen the police have probable cause to arrest one party, and when they reasonably

mistake a second party for the first party, then the arrest of the second party is a valid arrest."[4]  Hill v. California, 401 U.S. 797, 802 (1971).  The test for determining the reasonableness of an officer's belief that he was arresting the correct person is objective, based on the totality of the circumstances.  See Tennessee v. Garner, 471 U.S. 1, 8-9 (1985) (the question is "whether the totality of the circumstances justifie[s] a particular sort of . . . seizure.").

Plaintiff Day asserts that the arrest was not objectively reasonable because the reasonably prudent police officer would have known that Plaintiff Day was not the person identified in the warrant.  Plaintiff cites numerous opportunities Officer Milam had to confirm Plaintiff's innocence, but nevertheless neglected to ensure he was arresting the proper person.  As Plaintiff alleges, Officer Milam's conduct was reckless in that he failed to avail himself of readily available exculpatory evidence.

However, Plaintiff Day underestimates the wide latitude the Fourth Amendment affords to law enforcement in the case of a

---

[4]Officer Milam unquestionably had probable cause to arrest Fugitive Day.  Two warrants for Fugitive Day had been issued upon findings by a neutral and detached Fairfax magistrate that probable cause existed to arrest.  As the case law makes clear, the probable cause to arrest Fugitive Day is legally imputed to Officer Milam for his arrest of Plaintiff Day if the mistaken arrest is objectively reasonable.

mistaken arrest. The case of Johnson v. Miller, 680 F.2d 39, 40

(7th Cir. 1982), is instructive. There, a person named Annette

Jenkins used Ms. Johnson's name and account to defraud a bank.

Id. The bank mistakenly filed a criminal complaint against Ms.

Johnson and gave her address to the police. Id. Although the

description on the warrant was of a black female, 5'7" and

weighing 172 pounds, Ms. Johnson, who was white, was arrested.

Id. The charge was then dismissed, but again the warrant was

mistakenly reissued for Ms. Johnson and a second officer

rearrested her even though the warrant was for a black woman.

Id. When Ms. Johnson sued, the Seventh Circuit upheld the

objective reasonableness of the officer's conduct, ruling that

Ms. Johnson had not stated a claim under § 1983:

> We do not think the arresting officer, Miller, can be said
> to have acted wrongfully merely because the warrant he
> executed contained a description that did not match the
> appearance of Miss Johnson. For Miller the main thing was
> that the name was right. The purpose of the description
> was to help him, as the arresting officer, identify her . .
> . . If an officer executing an arrest warrant must do so at
> peril of damage liability under section 1983 if there is
> any discrepancy between the description in the warrant and
> the appearance of the person to be arrested, many a
> criminal will slip away while the officer anxiously
> compares the description in the warrant with the appearance
> of the person named in it . . . .

Johnson, 680 F.2d at 41. Since Johnson, other courts have

consistently upheld the reasonableness of mistaken arrests

pursuant to valid warrants despite discrepancies known to the

police, demonstrating the broad calculus for reasonableness

allowable to law enforcement under the Fourth Amendment. See Patton v. Przybylski, 822 F.2d 697, 698-700 (7th Cir. 1987) (plaintiff failed to state a Fourth Amendment claim when he alleged police arrested him based on a warrant that bore his name but had a different address); Chapman v. City of Atlanta, 192 Fed. Appx. 922, 924 (11th Cir. 2006) (finding reasonable the arrest of a white suspect who was clearly described in the warrant as a black individual); Harris v. Payne, 254 Fed. Appx. 410, 415-17 (5th Cir. 2007) (finding no Fourth Amendment violation when a white male with a similar name was arrested instead of a black suspect with a different social security number and date of birth; see also Connor, 490 U.S. at 396-97 (concluding that "the calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgments . . . .").

The undisputed facts here make clear that Officer Milam validly arrested Plaintiff Day because he acted with objective reasonableness. He was asked to find a black woman in her twenties named "Tori Day." Using the available police database, he located a black female named "Tori Day" with a prior arrest record. Further searches result in locating her place of employment in Herndon, Virginia, where the arrest was effected. Officer Milam arrested a 5'2" and 145 pound black female named Tori Day, albeit with a different middle name. Like in Johnson,

the outstanding warrant was not consulted by the officer and the wrong person was arrested.  However, just as in Johnson, the "main thing" for Officer Milam was that he pursued the description of the individual he was given in good faith, a black female in her twenties—a description which closely resembles Plaintiff Day.  The warrant was intended to help Officer Milam identify the proper party, but as Johnson and its progeny demonstrate, the law does not punish honest mistakes here with the imposition of liability under § 1983 when an officer fails to draw upon descriptions in the warrant.  Under the totality of the circumstances, therefore, Officer Milam's conduct was objectively reasonable.  He satisfied the minimal burden that the case law imposes on law enforcement under the circumstances by following his information, and diligently pursuing his leads.  While this Court has no doubt that Plaintiff Day experienced humiliation and anguish from her mistaken arrest, the test is whether an officer in Officer Milam's position could reasonably believe he had arrested the proper person.  For the stated reasons, the Court answers that inquiry affirmatively.  Therefore, because probable cause existed to arrest Fugitive Day, probable cause was imputed to Officer Milam when he arrested Plaintiff Day, as his mistake in identity was objectively reasonable.  Accordingly, Officer Milam

is entitled to summary judgment on Plaintiff's claim against him in his individual capacity under 42 U.S.C. § 1983.

Further, the doctrine of qualified immunity shields Officer Milam from Plaintiff's claim under § 1983 because his arrest of Plaintiff Day was supported by probable cause. The Fourth Circuit has definitively held "that the qualified immunity doctrine protects police officers who mistakenly make an arrest, so long as that arrest is supported by probable cause." Taft, 70 F.3d at 310. Indeed, qualified immunity "provides ample protection to all but the plainly incompetent" or those who knowingly violate the law. Malley v. Briggs, 475 U.S. 335, 341 (1986). To determine whether an officer is entitled qualified immunity, a court must (1) identify the specific constitutional right allegedly violated, (2) determine whether at the time of the alleged violation the right was clearly established, and (3) if so, then determine whether a reasonable person in the officer's position would have known that doing what he did would violate that right. Taft, 70 F.3d at 310. Thus, "[o]fficials have qualified immunity either if the facts do not make out a violation of a constitutional right or if the right was not clearly established at the time." Snider v. Seung Lee, 584 F.3d 193, 198 (4th Cir. 2009) (citing Pearson v. Callahan, 555 U.S. 223, 232 (2009)). In this case, the Court need only address the

first question, whether Plaintiff Day made out a violation of a constitutional right.

Here, Officer Milam necessarily did not and could not violate Plaintiff's right to be free from unreasonable searches and seizures because he had probable cause when he arrested Plaintiff Day.  Two warrants for Fugitive Day had been issued upon probable cause by a Fairfax magistrate, and as the case law makes clear, the probable cause to arrest Fugitive Day is legally imputed to Officer Milam for his arrest of Plaintiff Day if the mistaken arrest is objectively reasonable.  As stated supra, Officer Milam's actions were objectively reasonable because an officer in his position could reasonably believe he had arrested the proper person.  Because his arrest of Plaintiff was supported by probable cause, Officer Milam had qualified immunity during Plaintiff Day's arrest by operation of the case law.  Further, and for the reasons so stated by the Court, Officer Milam's mistake in identity cannot be described as plainly incompetent under Briggs, so as to vitiate his qualified immunity.  Accordingly, Officer Milam is entitled to qualified immunity as a matter of law and to summary judgment on Plaintiff's claim against him in his individual capacity under 42 U.S.C. § 1983.

Officer Milam is also entitled summary judgment on the common law tort claims in Counts VII-IX by operation of the

16

qualified immunity doctrine.  The Supreme Court of Virginia has
concluded that an officer's entitlement to qualified immunity
for a particular arrest vitiates liability for battery, assault,
and false arrest and false imprisonment claims based on that
arrest.  See DeChene v. Smallwood, 311 S.E.2d 749, 752 (Va.
1984) (concluding that where an officer acted in good faith and
with reasonable belief in the validity of an arrest, then causes
of action for battery, assault, and false arrest and false
imprisonment claims cannot be based on such an arrest).  The
Fourth Circuit has accepted and applied this decision.  Harrison
v. Deane, No. 09-2202, 2011 U.S. App. LEXIS 8873, at *5 (4th Cir
Apr. 29, 2011) (adopting the proposition that an officer cannot
be subjected to civil liability for false imprisonment or
assault and battery when the officer acted in good faith and
with probable cause).  Here, the Court has found that Officer
Milam was entitled to qualified immunity because his arrest of
Plaintiff Day was in good faith and supported by probable cause.
Accordingly, Officer Milam's immunized status in this case
forecloses any possibility of liability for battery, assault,
false arrest or false imprisonment, and he is therefore entitled
to summary judgment with respect to those claims.

The Court also grants Officer Milam's Motion for Summary
Judgment on the defamation claims because it finds that his
conduct causing erroneous information about Plaintiff Day to be

published lacked any actual malice and, thus, was insulated by the qualified privilege to defamation.  Generally, for a private individual to state a claim for defamation he need only show: "(1) publication by the defendant (2) of an actionable [communication] with (3) the requisite intent."  Skillstorm, Inc. v. Elec. Data. Sys., LLC, 666 F. Supp. 2d 610, 619 (E.D. Va. 2009) (citing Echtenkamp v. Loudoun Cnty. Pub. Schs., 263 F. Supp. 2d 1043, 1061 (E.D. Va. 2003)).  Defamatory words that cause "prejudice [to] a person in his or her profession or trade are actionable as defamation per se."  Fuste v. Riverside Healthcare Ass'n, 575 S.E.2d 858, 861 (Va. 2003) (internal quotation omitted).  However, when the communication at issue is one that touches a matter of public concern, "[a]ny one claiming to be defamed by the communication must show actual malice, or go remediless."  New York Times Co. v. Sullivan, 376 U.S. 254, 281 (1964).

Equally true, even where a communication may otherwise be defamatory, a qualified privilege operates to insulate a defendant from liability in "[a]ll communications made bona fide, upon any subject-matter in which the party communicating has an interest, or in reference to which he has a duty to a person having a corresponding interest or duty . . . ."  Isle of Wight Cnty. v. Nogiec, 704 S.E.2d 83, 88 (Va. 2011) (quoting Story v. Norfolk-Portsmouth Newspapers, Inc., 118 S.E.2d 668,

670 (Va. 1961)). This privilege subsists in such communications absent a showing of actual malice. Gazette, Inc. v. Harris, 325 S.E.2d 713, 727 (Va. 1985). Actual malice is shown by clear and convincing proof "that the speaker uttered defamatory words without believing them to be true, or lacked reasonable or probable grounds for believing them to be true." Great Coastal Express, Inc. v. Ellington, 334 S.E.2d 846, 854 (Va. 1985). Accordingly, when a published communication touches a matter of public concern and the defendant asserts the qualified privilege over that communication, a plaintiff must demonstrate that the defendant acted with actual malice by clear and convincing evidence both to state a claim for defamation and to defeat the defense of qualified privilege.

Here, Officer Milam's conduct in causing the publication of injurious and false statements concerning Plaintiff Day does not rise to the level of actual malice because Officer Milam reasonably believed, in good faith, that he was pursuing the proper arrestee. It is undisputed that Officer Milam caused to be published a false communication concerning the plaintiff which was ultimately injurious to her professional reputation. Indeed, the record is replete with evidence of the widespread nature of this publication of the Crime Solvers' webpage, of the incorrect information it contained purporting to be Plaintiff

Day's criminal record, and of the injury to her livelihood as she was not permitted to return to work that day.

However, it is the First Amendment which insulates Officer Milam's conduct from amounting to defamation and defamation per se.  Significantly, his otherwise defamatory communication to Crime Solvers touches a matter of public concern and heightens Plaintiff's Day's burden in this case to demonstrate actual malice by clear and convincing evidence.  Milam's communication touches a matter of public concern because the substance of the erroneous publication, and his purpose for publishing it, was for the public welfare. Additionally, police bulletins for public safety, such as Milam's communication to Crime Solvers in this case, amount to the kind of bona fide communications in which there is a public interest and to which the qualified privilege attaches.  Not only is communicating information about fugitives to the public reasonable, it is precisely the type of communication the law both encourages and protects.  Officer Milam's good faith mistake in target is irrelevant in this case, therefore, because he caused the communication at issue to be published pursuant to his bona fide responsibilities in which he had a clear interest, serving the public good.  Because his mistake was reasonable under the circumstances, Officer Milam's conduct does not rise to the level of actual malice as a matter

20

of law, and he is entitled to the qualified privilege from liability for defamation.

Finally, the Court grants Crime Solvers' Motion for Summary Judgment on the defamation claims because it finds Crime Solvers immunized from tort liability under the doctrine of charitable immunity.[5]  Like the qualified privilege, the doctrine of charitable immunity operates to absolve a defendant from some, but not all, tort liability to beneficiaries of the charity, so long as the charity exercised ordinary care in the selection and retention of its employees.  Memorial Hosp., Inc. v. Oakes, 108 S.E.2d 388, 393 (Va. 1959).  However, the "shield of charitable immunity does not extend to liability for acts of gross negligence or willful and wanton negligence."[6]  Ola v. YMCA of S. Hampton Rds., Inc., 621 S.E.2d 70, 72 (Va. 2005).  For the doctrine of charitable immunity to apply, a defendant organization must demonstrate: (1) its charitable status and purpose; (2) that it conducts its affairs in a charitable manner; (3) that the plaintiff was a member of the class of persons who benefitted from defendant's charitable work; and (4)

---

[5] The Court additionally concludes that Crime Solvers is also entitled to summary judgment based on the defamation defense of qualified privilege as discussed supra, and for the same reasons that it grants Officer Milam's Motion.

[6] Plaintiff Day does not challenge Crime Solvers' entitlement to charitable immunity on gross negligence or willful and wanton negligence grounds.  Therefore, to the extent that Crime Solvers is eligible for charitable immunity in this case, the Court shall deem any impediment based on such negligence conceded by Plaintiff Day.

that the defendant exercised ordinary care in the selection and retention of its employees.[7] Ola, 621 S.E.2d at 72-73.

The test for determining charitable status is whether the organization is "maintained for gain, profit, or advantage." Danville Community Hosp. v. Thompson, 43 S.E.2d 882, 884 (Va. 1947). Courts consider "not only . . . the powers and purposes as defined in [the charitable institution's] articles of incorporation or charter[,] but also . . . the manner in which it is conducted. Id. If a charitable purpose is so stated, "there is a rebuttable presumption it operates as a charitable institution in accordance with that purpose." Ola, 621 S.E.2d at 73. This presumption is defeated only by a showing that the defendant charity failed to conduct its affairs in a charitable manner. Id.

In this case, Crime Solvers is not maintained for gain, profit, or advantage, but to promote its aims by collecting revenue to disburse in the form of cash rewards for informational crime tips. Indeed, after Crime Solvers fulfills its charitable aims and satisfies operational costs there is nothing left to call profit. Moreover, Crime Solvers' bylaws

---

[7] Plaintiff Day does not allege that Crime Solvers failed to exercise ordinary care in the selection and retention of its employees. Because Plaintiff Day does not challenge Crime Solvers' evidence on the quality of its selection or retention of its employees, the Court finds this element satisfied as a matter of law.

comport with its conduct as a not-for-profit organization, among them: "[t]o expand Fairfax County business community and citizenry awareness and participation in Crime Solvers' activities in Fairfax County," and "[t]o develop a stable and consistent base of support in terms of contributions which would allow Crime Solvers to increase the amount of payouts to informants. . . ." Finally, Crime Solvers is classified as a public charity and is exempt from federal income tax as a 26 U.S.C. § 501(c)(3) organization. Accordingly, Crime Solvers exemplifies the classic non-profit charitable organization and, therefore, meets the requirements for charitable status.

    To determine if a defendant organization conducts its affairs in a charitable manner, a court may make the following inquiries: (1) Is the entity's financial purpose to break even or earn a profit?; (2) Does the entity in fact earn a profit and, if so, how often does that occur?; (3) If the entity earns a profit (a surplus beyond expenses), must that be used for a charitable purpose?; (4) Does the entity depend on contributions and donations for a substantial portion of its existence?; (5) Are the directors and officers of the entity compensated and, if so, on what basis? Ola, 621 S.E.2d at 73; see also Oakes, 108 S.E.2d at 391. As examined infra, Crime Solvers is a private, non-profit corporation, and its financial purpose it to take in sufficient revenue to adequate promote its charitable aims, not

to turn a profit. Although Crime Solvers receives cash
donations from citizens, it immediately turns that money around
in the form of cash reward offers for information leading to the
arrest of fugitives. Thus, to the extent it does experience a
surplus, that money is immediately redirected to cash rewards
for information. Moreover, the officers and directors of Crime
Solvers receive no compensation for their services. Upon a
weighing of the factors set forth under Ola, therefore, Crime
Solvers indisputably conducts its affairs in a charitable
manner.

The Court further finds that Plaintiff Day is a
beneficiary of Crime Solvers' charitable aims. The Supreme
Court of Virginia has concluded that "a person is a beneficiary
of charity if he or she has a 'beneficial relationship' to the
charitable organization. Ola, 621 S.E.2d at 77 (internal
citation omitted). To be within such a beneficial relationship,
"an individual need not receive financial assistance from a
charitable entity to be a beneficiary of that organization," but
merely needs to be "a person who receives something of value,
which the organization[,] by its charitable purpose, undertakes
to provide." Id. (citing Egerton v. R.E. Lee Mem'l Church, 395
F.2d 381, 384 (4th Cir. 1968)). Here, it is apparent that
Plaintiff Day was a beneficiary of Crime Solvers because she,
like others in who work in the Fairfax County area, received its

community-wide benefits.   Indeed, the "value" that Plaintiff Day

received from the efforts of Crime Solvers was a safer

workplace.   Thus, it is unquestionable that Plaintiff Day was a

beneficiary of Crime Solvers at the time it published false and

injurious information concerning her on its website.

Accordingly, Crime Solvers is entitled to charitable immunity

from liability on Plaintiff Day's defamation claims as a matter

of law.

        For the foregoing reasons, the Court will grant both

Officer Milam's and Crime Solver's Motions for Summary Judgment.

        An appropriate order shall issue.


                                        _____/s/_____
                                        Claude M. Hilton
                                        United States District Judge



Alexandria, Virginia
October 28, 2011